**Slip Op. 02-81**

**United States Court of International Trade**

```
┌─────────────────────────────────────────┐
│                                         │
│ CHEFLINE CORPORATION, ET AL.,           │
│                                         │
│              Plaintiffs,                │
│                                         │
│         v.                              │
│                                         │
│ UNITED STATES,                          │
│                                         │
│              Defendant,                 │
│                                         │
│              and                        │
│                                         │
│ THE STAINLESS STEEL COOKWARE COMMITTEE, │
│                                         │
│              Defendant-Intervenor.      │
│                                         │
└─────────────────────────────────────────┘
```

Before: Pogue, Judge

Court No. 00-05-00212

**Public Version**

[Agency determination affirmed.]

Decided: August 5, 2002

Hogan & Hartson LLP (Lynn G. Kamarck, Craig A. Lewis), for Plaintiffs.

Lyn M. Schlitt, General Counsel; Marc A. Bernstein, Acting Assistant General Counsel; Laurent M. de Winter, Attorney, Office of General Counsel, U.S. International Trade Commission, for Defendant.

King & Spalding (Joseph W. Dorn, Stephen A. Jones, Christine E. Savage), for Defendant-Intervenor.

**OPINION**

**Pogue, Judge:** On September 26, 2001, this Court remanded certain aspects of the United States International Trade Commission's ("Commission") final determination in Porcelain-on-Steel Cooking Ware from China, Mexico, and Taiwan, and Top-of-the-Stove Stainless Steel Cooking Ware from Korea and Taiwan, Inv. Nos. 701-TA-267 &

268 (Review) and 731-TA-297-299, 304 & 305 (Review), USITC Pub. 3286, (March 2000)("Review Determination"). See Chefline v. United States, 25 CIT __, 170 F. Supp. 2d 1320 (2001)("Chefline I").[1]

The remand order directed the Commission to reconsider its decision to cumulate top-of-the-stove stainless steel cookware from Korea and Taiwan. In the event that the Commission should decide not to cumulate, the Commission was instructed to reconsider whether revocation of the orders on Korean top-of-the-stove cookware would likely lead to continuation or recurrence of material injury to the domestic industry, within a reasonably foreseeable time.

After reopening the record, the Commission determined that there was not enough evidence to support cumulating subject imports from Korea and Taiwan, and affirmed its determination that subject imports from Korea would, upon revocation of the antidumping and countervailing duty orders, likely result in injury to the United States market within a reasonably foreseeable time. Plaintiffs Chefline Corporation, Inc., Daelim Trading Co., Ltd., Dong Won Metal Co., Ltd., Hai Dong Stainless Steel Co., Ltd., Kyung Dong Industrial Do., Ltd., Namyan Kitchenflower Co., Ltd., O'bok Stainless Steel Co., Ltd., and Sam Yeung Industrial Co., Ltd. (collectively "Plaintiffs" or "Chefline") contest the Commission's affirmative determination of antidumping and countervailing duty

---

[1]Familiarity with the court's earlier opinion is presumed.

orders on top-of-the-stove stainless steel cookware from Korea. After review of the issues raised by the Plaintiff, we uphold the Commissions' determination.

**Standard of Review**

The Commission's determination will be upheld unless it is unsupported by substantial evidence in the administrative record or is otherwise not in accordance with the law.  See 19 U.S.C. § 1516a(b)(1)(B)(I)(1994).

Substantial evidence is "more than a mere scintilla," Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938), but "something less than the weight of the evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  The Court's function is not to re-weigh the evidence but rather to ascertain whether there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co., 305 U.S. at 229.

**Analysis**

**I.   Cumulation**

Under 19 U.S.C. § 1675a(a)(7), either a finding that imports will have no discernible adverse impact on the domestic industry or a finding that there is no reasonable overlap of competition between imports from different countries is sufficient to preclude

cumulation.  See also Neenah Foundry Co. v. United States, __ CIT __, __, 155 F. Supp. 2d 766, 771 (2001).  In our original review of the Commission's sunset determination we found that there was not substantial evidence supporting either a finding of reasonable overlap of competition between Korean and Taiwanese imports or a finding that Taiwanese imports would have a discernible adverse impact.

Upon remand, the Commission sought to supplement the record by sending questionnaires to over forty companies in Taiwan, in order to gather information on the nature of Taiwanese subject imports. Remand Determ. at 8.  Although none of the Taiwanese producers provided data in response to the questionnaires, the Commission was able to collect information from telephone conversations with Taiwanese producers and importers of Taiwanese top-of-the-stove stainless steel cooking ware.  Id.

Although one Taiwanese manufacturer stated that it produced high-end merchandise, the Commission was unable to ascertain whether the Taiwanese high-end merchandise was equivalent to high-end merchandise sold in the U.S. market.  In another telephone conversation, an importer of subject merchandise from Korea and Taiwan indicated that "although Taiwan had the capability of producing higher-end stainless steel cooking ware, Taiwan producers were not as good at producing it."  Id.  The Commission also found that the average unit value of cooking ware from Taiwan is

substantially less than that for cooking ware from Korea, suggesting that recent imports from Taiwan were probably not high-end cooking ware.  Based on this new information, the Commission concluded that subject imports from Taiwan were of a lower quality than the Korean product.  See Remand Determ. at 6.  Therefore, the Commission found that there was no reasonable overlap of competition between subject imports from Korea and Taiwan and declined to cumulate subject imports from the two countries.  See Id. at 5 (holding that because the finding of no reasonable overlap is "dispositive of the cumulation issue, we do not address the issue of no discernible adverse impact").  On the limited record here, the evidence of Taiwanese production is sufficient for a reasonable person to conclude that the Taiwanese producers do not sell high-end products.  Accordingly, we find the Commissions decision not to cumulate imports from Taiwan and Korea to be supported by substantial evidence.

## II.  Antidumping and Countervailing Duty Orders on Top-of-the-Stove Stainless Steel Cooking Ware from Korea

Because the Commission determined there was not enough evidence to support cumulating subject imports from Korea and Taiwan, it was required to reexamine the determination that revocation of the antidumping and countervailing duty orders on Korean subject imports would be likely to lead to a continuation or recurrence of material injury within a reasonably foreseeable time.

The Commission found that even without cumulating subject imports, the orders regarding Korean subject imports should not be revoked.

### A.    Rebuttal Comments

As a preliminary matter, Chefline appeals the Commission's rejection of Chefline's rebuttal comments and asks the Court to take judicial notice of these comments.

### 1.    Background

In the remand proceeding, the Commission reopened the record "for the limited purpose of (1) seeking basic information regarding subject product from Taiwan and (2) seeking to cure the possible inclusion of non-subject products in official import data." Letter from USITC to Hogan & Hartson, LLP (Dec. 10, 2001), Pl.'s App. 1, at 1. The Commission asked all interested parties to submit two sets of comments. The first set of comments was limited to information on the likelihood of overlap of competition between Taiwanese and Korean imports with the domestic like product, whether using a value-based instead of a quantity-based statistic would be a more accurate measure of subject import volume, and "the extent to which non-subject merchandise from Korea and Taiwan is included in United States [HTSUS] 7323.93.00.30 (i.e. the ratio of subject to non-subject merchandise)." Id. at 2. These comments, due by December 28, 2001, could include new factual

information.[2]

The parties were also informed that they could submit a second set of comments "responding to other parties' first sets of comments or to new information released to the parties by the Commission too late to be included in the first set of comments." Id.  The Commission made clear that these comments, due at the close of business on January 4, 2001, could not include any new factual information.  Id.[3]

As part of their first set of comments, Defendant-Intervenor Stainless Steel Cookware Committee provided a sworn affidavit by the Executive Vice President of the Cookware Manufacturers Association ("CMA"), Hugh Rushing.  See Comments on Remand by the Stainless Steel Cookware Committee at Ex. 1("Rushing Affidavit")(Dec. 20, 2001), Def.-Int.'s Conf. App. at 16 ("Committee's Remand Comments").[4]  The Rushing Affidavit, based on CMA data, estimated that 97 percent of Korean 7323.93.0030, HTSUS,

---

[2]Originally, the scheduled deadline was December 10, 2001. The Commission, however, notified parties that this date was extended to December 28, 2001.  See Correspondence from George Deyman to Lynn Kamarck, Def.-Int. App. at Ex. 15 (Dec. 11, 2001).

[3]The deadline for the second set of comments was also extended from January 2, 2002 to January 4, 2002.  See Correspondence from George Deyman to Lynn Kamarck, Def.-Int. App. at Ex. 15 (Dec. 11, 2001).

[4]CMA is a voluntary trade association representing United States and Canadian manufacturers and importers of cookware.  See Rushing Aff. ¶ 1.

imports were top-of-the-stove stainless steel cookware.  On January 7, several days after the end of the comment period, Chefline submitted rebuttal comments on the Rushing Affidavit to the Commission.

The Commission rejected Chefline's comments for being untimely and containing new information, in violation of its instructions.  Chefline argues that nothing in the Commission's statute or regulations addresses this type of situation and that 19 U.S.C. § 1677m(g), contrary to the Commission's suggestion, does not apply to new information submitted by parties to the case; rather, Chefline argues that 19 U.S.C. § 1677m(g) is only applicable for new information obtained by the Commission.  Pl.'s Mem. Supp. Mot. J. Agency R. at 18 ("Chefline Br.").  Chefline also claims that the "Commission was clearly wrong to reject this data," because "[t]he Rushing Affidavit clearly provided information beyond the parameters of the instructions to the parties regarding written submissions."  Id. at 17.  Lastly, Chefline contends that the information contained in the rebuttal comments is public information of the type for which judicial notice is appropriate.

## 2.  Commission's Rejection of Chefline's Comments

### A) Commission's Statutory Guidelines

The Commission gathers new information pursuant to 19 U.S.C. § 1677m(g).  Section 1677m(g) provides that:

> Information that is submitted on a timely basis to the administering authority or the Commission during the

course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

19 U.S.C. § 1677m(g).[5] Although Chefline claims that section 1677m(g) applies only to new information obtained by the Commission, rather than new information submitted by parties, see Chefline Br. at 18, the statute also includes information "that is submitted on a timely basis to the administering authority or the Commission." 19 U.S.C. § 1677m(g)(emphasis supplied). Furthermore, the Commission is required to close the record "prior to the time the agency's determination is made, and . . . the parties to the proceeding [are to] be permitted a final opportunity to comment on all information obtained by the agency upon which the parties have not yet had an opportunity to comment." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-826 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 at 871

---

[5]It is within the agency's discretion to set a reasonable time frame for gathering information. 19 U.S.C. § 1677m(g). Any information given to the agency by the date it sets is considered timely. Id.

("SAA").[6]  Both 1677m(g) and the SAA expressly include information submitted to the agency, such as that at issue here.

Chefline further argues that the Commission's regulations do not even address remand proceedings, particularly when such proceedings allow for new information to be submitted for the record.  Chefline Br. at 18.  Section 1677m(g), however, refers to final determinations made under 19 U.S.C. § 1675, among others. The determination at issue is a sunset review remand determination. Sunset reviews are made pursuant to section 1675(c).  Although the Commission's procedural regulations do not contain provisions specifically directed to remand proceedings, the reference to section 1675 is sufficient to permit application of the regulation to remand proceedings conducted within the context of a sunset review proceeding.[7]

B)  Rushing Affidavit

Chefline also argues that the Rushing Affidavit does not address the limited issues upon which the Commission allowed new factual submissions.  According to the Commission's letter new information could be submitted to help it determine "the extent to

---

[6]The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

[7]Chefline also did not object when the Commission provided a schedule for submissions and delineated the type of submissions appropriate for each date.

which non-subject merchandise from Korea and Taiwan is included in United States [HTSUS] 7323.93.00.30 (i.e. the ratio of subject to non-subject merchandise)." Letter from USITC to Hogan & Hartson, LLP at 2 (Dec. 10, 2000), Pl.'s App. 1 at 1. The Rushing Affidavit estimated the aggregate United States market for top-of-the-stove stainless steel cookware and stainless steel bakeware. It then extrapolated from this information to determine the percentage of imports from Korea and Taiwan under HTSUS item number 7323.93.00.30.

Thus, the Affidavit attempts to determine the extent to which subject and non-subject merchandise from Korea and Taiwan is included in 7323.93.00.30, HTSUS, concluding that such items constitute 97 percent and 3 percent, respectively, of imports under the HTSUS number. Accordingly, without determining whether the Rushing Affidavit supports the Commission's finding, as will be discussed infra page 16-17, we find that the Affidavit addresses the precise issue contemplated by the Commission's directive.

### 3.   Judicial Notice

Chefline also asks the Court to take judicial notice of the information proffered to rebut the Rushing Affidavit because it is public information. See Chefline Br. at 18. The court takes judicial notice pursuant to Fed. R. Evid. 201(c). Although the court is mindful of the deference owed to the Commission in the administration of antidumping laws, judicial notice is proper when

"credible evidence from outside the record indicates a significant error" in the agency's determination. <u>Union Camp Corp. v. United States</u>, 23 CIT 264, 269, 53 F. Supp. 2d 1310, 1324 (1999). The result of judicial notice "is effectively no different from a reversal for reconsideration because a fact relied on is unsupported by the evidence." <u>Borlem S.A.-Empreedimentos Industriais v. United States</u>, 913 F.2d 933, 940 (Fed. Cir. 1990).

Here, Chefline submitted scope determinations and customs rulings indicating that HTSUS 732.93.0030 includes numerous non-subject product categories other than ovenware and several newspaper articles discussing the composition of the cookware and bakeware industry. <u>See</u> Korean Producers' Comments (Jan. 4, 2002), Attach. 1, 2. Although the scope descriptions and customs rulings discuss non-subject articles contained in HTSUS 7323.93.00.30 besides kitchenware and bakeware, they do not contradict the information contained in the Rushing Affidavit. It is apparent from the calculations in the affidavit that the Rushing Affidavit uses the term "bakeware" as a catch-all category. <u>See</u> Rushing Aff. ¶ 4.[8] Such a catch-all category would include the various articles

---

[8]Rushing stated that:
[t]he CMA estimated that the total [annual] value[s] of shipments of stainless steel bakeware (including ovenware) in the U.S. market in 1997, 1998, and 1999, were [                                              ], respectively. In contrast, the CMA's estimates of the total shipments (including imports) of top-of-the-stove stainless steel cookware during those years were [                                              ], respectively.

Chefline presents in the submitted scope reviews.

Also, according to the articles submitted with Chefline's rebuttal comments, the bakeware industry grew between 5 and 10 percent in 1999. As a result, Chefline argues that bakeware constitutes a larger percentage of 7323.93.00.30, HTSUS, than Rushing's estimate. These articles, however, also present data that the stainless steel cookware industry grew by as much as 15 percent. See, e.g., New NPD Hometrak Data Reveals Kitchenware Gains, HFN Weekly (Apr. 3, 2000), Korean Producers' Comments (Jan. 4, 2002), Attach. 2. No comparison is contained within the articles between stainless steel bakeware and top-of-the-stove cookware; rather, the articles focus on one segment of the industry. It is plausible that even though the bakeware industry grew, the relative percentages of bakeware and top-of-the-stove stainless steel cookware remain the same. Therefore, the agency could reasonably conclude that top-of-the-stove stainless steel cookware still constitutes 97 percent of merchandise imported under 7323.93.0030, HTSUS.

Although the articles offered by Chefline demonstrate that there is another way to interpret the Rushing Affidavit, they do not contradict the evidence already on the record. As a result, it

---

Thus, based on the aggregated market for top-of-the-stove stainless steel cookware and stainless steel bakeware, stainless steel bakeware accounted for only 2.4 to 2.9 percent of the total market in 1997-1999.
Rushing Aff. ¶ 4.

is not proper for this Court to take judicial notice of Chefline's rebuttal comments.

### 4. Conclusion Regarding Chefline's Rebuttal Comments

There is nothing in the record to suggest that Chefline did not have every opportunity to file new factual information, pursuant to the Commission's timeline.[9] Here, Chefline failed to present new information during the period assigned by the Commission. Moreover, Chefline did not ask for an extension of the Commission's schedule in order to gather information on the Rushing Affidavit. Finally, Chefline did not offer any cause or necessity for the untimeliness of its submission. The Commission's decision to reject Chefline's untimely submissions is therefore in accordance with law.

### B. Section 1675a(a)(1)

Pursuant to section 1675a(a)(1), the Commission analyzes the likely volume, price effects, and impact of subject imports if the orders are revoked. Chefline challenges only the Commission's affirmative determinations with respect to likely volume and price effects. Chefline also claims that the data used by the Commission in its analysis of the likely volume of imports from Korea

---

[9]According to Defendant-Intervenor Stainless Steel Cookware, the Rushing Affidavit was actually submitted on December 20, 2001, eight days before the closing of the record. Therefore, Chefline still had time after the Rushing Affidavit was submitted to give the Commission rebuttal comments containing new information.

overstates the amount of Korean subject imports.

### 1.    Likely Volume

    A)    Data Issues

The imports at issue here are entered into the U.S. under 7323.93.0030, HTSUS.[10]    This provision is a basket provision, including not only top-of-the-stove stainless steel cookware but products such as stainless steel bakeware and ovenware.[11]   In the original sunset review, the Commission based its affirmative determination calculation on the quantity of subject imports.   The Commission subtracted the volume of imports of cookware reported by

---

[10]In the original investigation the goods were entered under 653.94, TSUS, also a basket provision.  The Commission was able to adjust the total volume of imports reported under the TSUS number to account for the volume and quantity of non-subject merchandise classified under the subheading.  Top-of-the-stove Stainless Steel Cookware from Korea and Taiwan, Inv. 701-TA-267-268 (Final) and 731-TA-304-305 (Final), USITC Pub. No. 1936 (Jan. 1987) at A-34 & n.1, A-35 & n.1 ("Original Determ.").  Since the time of the original investigation, the U.S. adopted the HTSUS. Also, the Commission was unable to gather the same type of information available in the original investigation that allowed the Commission to account for non-subject imports.  Therefore, in the present investigation the Commission was unable to adjust for non-subject imports in the same manner as it had in the past.

[11]Subheading 7323.93.0030, HTSUS, in relevant part, provides:

| 7323 | Table, kitchen or other household articles and parts thereof, of iron or steel; iron or steel wool; pot scourers and scouring or polishing pads, gloves and the like, of iron or steel: |
| * * * | |
| 7323.93.00 | Other:    Of stainless steel |
| * * * | |
| 7323.93.0030 | Other:    Cooking ware |

responding firms from the total volume of imports under subheading 7323.93.0030, HTSUS, to arrive at the volume of subject imports from non-responding firms.  This methodology, however, did not adjust for non-subject articles contained in the HTSUS heading and therefore overstated imports from non-responding producers.  In Chefline I, this Court held that although it may be reasonable to rely on official import statistics given the lack of other data, the Commission either had to adjust the data for non-subject articles or explain the reason for its change in methodology.

The Commission then reopened the record in order to correctly adjust for the amount of non-subject articles accounted for in the official import statistics for 7323.93.0030, HTSUS.  Defendant-Intervenor Stainless Steel Cookware submitted the Rushing Affidavit, based on information compiled by CMA.  See Rushing Aff. ¶ 1.  The CMA compiles statistics on the size of the U.S. market for various goods, such as top-of-the-stove cookware, bakeware (including ovenware), and kitchenware.  Id. at ¶ 3.  As noted above, according to the CMA's information, stainless steel bakeware, used as a catch-all category for all non top-of-the-stove stainless steel cookware, accounted for only 2.4 to 2.9 percent of the total U.S. market for stainless steel cookware and bakeware for the years 1997 through 1999.  Id. at ¶ 4.  Rushing argued that

> [b]ased on the percentage of the aggregate market for top-of-the-stove stainless steel cookware and stainless steel bakeware accounted for by stainless steel bakeware, which is less than 3 percent . . . [one could] estimate

> that, during 1997-1999, over 97 percent of imports from
> Korea and Taiwan under HTSUS item number 7323.93.00.30
> were top-of-the-stove stainless steel cookware.

Id. at ¶ 6.

Chefline contends that the Rushing Affidavit does not address the key remand issue – "the extent to which non-subject merchandise from Korea and Taiwan is included in the [HTSUS 7323.93.00]." Chefline's Br. at 12. Rushing does, however, address this issue by estimating the percentage of subject merchandise included in 7323.93.00.30, HTSUS, based on data assembled from the U.S. market. Although this information does address the key issue on remand, we agree with Chefline that Rushing makes several unsupported "assumptions." Rushing does not explain why it is reasonable to assume that the composition of Korean imports reflects the composition of the U.S. market as a whole. Accordingly, the affidavit alone, without additional support, would not support the Commissions' affirmative antidumping and countervailing duty determination. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)(The agency must articulate a satisfactory explanation for its actions including a "rational connection between the facts found and the choice made.").

The Commission, however, recognized the limited application of the CMA data and Rushing Affidavit. See Remand Determ. at 12 n.33. As a result, the Commission did not rely solely on the Rushing Affidavit when deciding to adjust the official import statistics by

three percent.  The Commission also looked at data from the Korean Metal Ware Industry Association ("KMWIA") to determine if it supported Rushing's premise.  Id. ("We recognize that the CMA data measures the entire U.S. market and not specifically imports from Korea.  However, we believe this information is the most probative information available on the record, particularly given that the information provided by the Korean producers themselves corroborates it.").

KMWIA maintains statistics on the value and quantity of Korean stainless steel cookware shipments to the U.S.  It reported the value of Korean shipments of subject merchandise in 1997 as [                ], and in 1998 as [                ].  See Korean Producers' Resp. to Notice of Institution of Sunset Reviews, C.R. 4 at 25 (March 23, 1999).  The Commission then compared the Korean respondents' data to official import statistics that indicated that in the same years total imports from Korea under HTSUS 7323.93.00.30 were [          ] and [          ], respectively. Based on this information, the Commission concluded that between 94.4 and 98.8 percent of imports reported under 7323.93.00.30, HTSUS, are subject imports.  This calculation supports Rushing's estimate.  As a result, the Commission decision to use the official import data as adjusted for non-subject imports is supported by substantial evidence.

    B)    All Relevant Economic Factors

     When evaluating the likely volume of imports of the subject

merchandise, the Commission is directed to consider "all relevant

economic factors."   19 U.S.C. § 1675a(a)(2).   These economic

factors include, but are not limited to,

    A)    any likely increase in production capacity or
          existing unused production capacity in the
          exporting country,
    B)    existing inventories of the subject merchandise, or
          likely increases in inventories,
    C)    the existence of barriers to the importation of
          such merchandise into countries other than the
          United States, and
    D)    the potential for product-shifting if the
          production facilities in the foreign country, which
          can be used to produce the subject merchandise, are
          currently being used to produce other products.

Id. According to Chefline, the Commission erred when it found that

an increase in imports from Korea would result in an increase in

sales of Korean product in the direct sales channel[12] of

distribution.   Chefline also contends that the Commission's

determination that the volume of subject merchandise from Korea

would increase was based on miscalculation and speculation.

          1.    Channels of Distribution

     One of the economic factors the Commission took into

_____

     [12]The direct sales market includes companies that sell
directly to the end-consumer, i.e. the "demonstration" or "door-
to-door" market.  See Committee's Prehearing Br. at Ex. 13, Aff.
Keith L. Peterson ¶ 3; see also Staff Report at I-16 n.10. The
direct sales market for the cookware industry is "predominantly a
market for premium-quality stainless steel cookware," Def.-Int.
Br. at 43;  see also Remand Determin. at 16; Hrg. Tr., P.R. 153
at 34 (Mr. Reigle), the quality of which is at issue here.

consideration was the different channels of distribution for top-
of-the-stove stainless steel cookware.  Two markets exist for the
sale of top-of-the-stove stainless steel cookware: direct sales and
retail.[13]  Presently, the majority of sales of subject imports occur
in the retail market.  Domestic merchandise, however, has generally
been  sold  in  the  direct  sales  market.[14]   The  Commission  held,
however,  that  upon  revocation  of  the  orders  that  it  was  likely
Korean  producers  of  subject  merchandise  would  increase  their
participation  in  both  the  retail  and  direct  sales  markets.[15]   The
Commission  also  found  that  an  increase  in  retail  sales  of  subject

---

[13]Retailers include "off-price retailers, mail order
sellers, mass retailers, department stores, and gourmet stores."
Porcelain-on-Steel Cooking Ware from China, Mexico, and Taiwan,
and Top-of-the-Stove Stainless Steel Cooking Ware from Korea and
Taiwan, Staff Report to the Commission, C.R. 33 at II-3(Feb. 29,
2000)("Staff Report").

[14]The retail market, however, "represents a growing share of
sales by U.S. producers."  Remand Determ. at 17 n.53 (citing
Staff Report at Table III-A-4).  U.S. producers now sell 31.1
percent of their total shipments to retail outlets in comparison
to 16.4 percent in 1997.  Therefore, it is reasonable for the
Commission to conclude that the volume of Korean imports in the
retail sector will have a greater affect on the domestic industry
than in past years.

[15]In general, the Commission is not required to conduct a
segmented market analysis.  See Nippon Steel Corp. v. United
States, 182 F. Supp. 2d 1330, 1337 n.12 (2001)("There is no
statutory requirement that the Commission conduct a 'market
segmentation' analysis in any particular case."); Copperweld
Corp. v. United States, 12 CIT 148, 162, 682 F. Supp. 552, 566
(1988). Section 1677(4)(A)defines the relevant industry as the
"domestic producers as a whole of a like product, or those
producers whose collective output of a domestic like product
constitutes a major proportion of the total domestic production
of that product."

imports would negatively impact direct sales of domestic top-of-the-stove-stainless steel cookware.

The Commission based its finding that subject merchandise was likely to increase in both the retail and direct sales market on Korea's ever-changing participation in the U.S. stainless steel market. During the original period of investigation, Korean respondents sold primarily low- and mid-range cookware. See Remand Determ. at 17. By 1997, Korean producers' presence in the low-range market decreased because of the influx of low-range imports from China, Indonesia, and Taiwan, amongst others. See Remand Determ. at 17. In response, Korean producers focused on the mid- and high-range market. Id. at 17. The domestic industry was also increasingly focused on the high-range market. Id. This record indicates that the composition of Korean imports shifted over time. The Commission's affirmative determination was based on the conclusion that this trend was likely to continue.

Moreover, the Commission found that Korean producers have already penetrated the direct sales market. Korean producers calculated their participation in the direct sales market as [   ] percent. The Korean producers estimated percentage of subject imports in the direct sales channel, however, does not reflect the Korean producers' share of total sales in the direct sales market. See Def.-Int. Br. at 48. Rather, it represents merely the value of subject imports sold in the direct sales channel compared to total

sales of subject imports. The significance of this number is, therefore, limited. Furthermore, Korean producers concede that there is a possibility that merchandise sold to wholesalers or distributors may have been resold to direct sales companies and not accounted for in the [   ] percent calculation, Korean Producers' Posthearing Br., C.R. 20, at Ex. 1, 35-36, further limiting the significance of Korean producers' calculation.

In determining the likely volume of top-of-the-stove stainless steel cookware the Commission also took into account the composition of Korean producers' U.S. sales offices. Several employees in the U.S. sales offices of Korean respondents were previously affiliated with U.S. stainless steel cookware producers as either sales representatives or distributors thereby eliminating some of the barriers to entering the direct sales market. Hrg. Tr., P.R. 153 at 37. This, coupled with Korean producers' interest in increasing exports to the U.S., further supports the Commission's conclusion that subject imports are likely to increase in the direct sales sector. See Remand Determ. at 16 n.52; (citing Memorandum from [

] to U.S. producer Regal Ware Inc., Committee Prehearing Br., Ex. 18 at 1 (Jan. 22, 1999)(seeking assistance in removing the antidumping duty orders because they have been "insurmountable stumbling blocks for exporting stainless steel cooking ware from Korea to the States.")).

Even though Korean respondents indicate that subject imports only account for a small percentage of the direct sales market, the Commission considers not only the present portion of the market but the likelihood of increased volumes.  The statute and legislative history are clear: the Commission is not required to find that subject imports currently compete in the U.S. market. See SAA at 884 ("The likelihood of continuation or recurrence of material injury standard is prospective in nature, and, thus, a separate determination regarding current material injury is not necessary.").  The Commission instead uses the "current state of the market and the behavior of subject imports over the life of the orders to predict what is likely to occur upon revocation of the orders."  Def.-Int. Br. at 50.  According to the SAA, "under the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonable foreseeable future of an important change in the status quo."  SAA at 883-84.  The Commission conducted such an analysis – it found, based on the previous behavior of Korean producers, that the subject imports would likely increase in the direct sales channel and thereby further harm domestic producers.

### 2.   Other Relevant Economic Factors

The Commission's finding that subject imports in the direct sales channel are likely to increase upon revocation of the orders is just one of the many findings relied upon by the Commission when

it determined that subject imports, overall, would likely increase. The Commission also found that Korea had the flexibility to increase  shipments to the U.S.[16]

Section 1675 directs the Commission to consider any likely increase in production capacity or existing unused capacity in the exporting country.  The Commission found that due to a decline in U.S. capacity since the original investigation, the U.S. market is now more vulnerable to an increase in Korean subject imports.  See Remand Determ. at 15 ("Thus, an increase in subject imports from Korea at the expense of the domestic industry would not need to be as large in absolute terms as it was during the original period of investigation to be significant under current conditions.").

The Commission then attempted to determine Korean capacity levels.  Both KMWIA and the domestic industry submitted data to the Commission on Korean production capacity.  See Staff Report at IV-19, Table IV-7. Neither group, however, could agree on the production capacity or capacity utilization estimates.  See id.[17]

---

[16]Although the Commission did not focus on barriers to exports from Korea to third-country markets, it did note that South Africa also imposed antidumping duties on Korean cookware. See Remand Determ. at 16 n.51; Staff Report at IV-18.

[17]For example, in 1997 KMWIA estimated Korean production capacity as 18,700,000 units while the petitioners' estimated Korean production capacity at [          ] units.  Staff Report at IV-19, Table IV-7.  Disagreement also existed with regards to capacity utilization.  In 1997 KMWIA estimated capacity utilization at 97.7% while the petitioners' estimated it at [   ] percent.  Id.  The domestic industry argued that KMWIA was "concealing Korea's true stainless steel cookware production

Even though the production capacity information was in dispute, the record indicates that Korean producers have the flexibility to increase shipments to the U.S. regardless of the stated capacity utilization.  See Remand Determ. at 15 n.44 & n.47 (citing to Staff Report at IV-19, Table IV-7).  According to the Korean respondents, during the period of review capacity utilization was between 89.8 and 97.7 percent.  See Staff Report at Table IV-7.  Specifically, in interim 1998 capacity utilization was 89.8 percent and in interim 1999 it was 91.9 percent.  Id.  During this same period, however, subject imports increased 45 percent by value.  Id. at C-5, Table C-2; see also Hrg. Tr., P.R. 153 at 37.

The Commission also determined that "importers of the subject Korean merchandise maintained high levels of inventory (as a percentage of importers' shipments) throughout the review period." Remand Determ. at 16.  The high levels of inventory, according to the Commission, "indicate . . . a commitment to having a sizeable presence in the United States."  Id.

The Commission compiled data on U.S. importers' end-of-period inventories of imports from Korea.  See Staff Report at IV-9, Table IV-4.  The Commission found that U.S. importers held substantial inventories, specifically [      ] Korean  units in 1997, [         ] units in 1998, [     ] units in interim 1998, and

---

capability."  Id. at IV-18 (citing Petitioners' Prehearing Br. at 58-69).

[     ] units in interim 1999.  Id.  The ratio to imports for those same years was [    ]%, [    ]%, [    ] %, and [    ]%, respectively.  Id.  Dissenting Vice Chairman Deanna Tanner Okun cites to Korean respondents end-of-period inventories, which declined during the period of review. See Remand Determ. at 26 (citing Staff Report at Table IV-6).  The total amounts of inventory, however, could reasonably be found to be relatively high.  Furthermore, although the Commission could have interpreted the information in a different manner, the data can reasonably be interpreted to support the Commission's conclusion.

According to the Commission, Korean producers also "have substantial flexibility to shift exports to the United States." Remand Determ. at 15.  Korean producers consistently exported between 63 and 68 percent of their merchandise.  Exports to the U.S., however, constituted less than one third of these exports. Also, the distribution between the home market, the U.S., and other export markets varied from year to year.  Therefore, the evidence supports the conclusion that there is the flexibility to shift exports to the U.S.

## 2.  Likely Price Effects

In evaluating the likely price effects of subject imports, the Commission considers whether there is likely to be significant underselling by the subject imports as compared with domestic like products and whether the subject imports are likely to enter the

United States at prices that would have a significant depressing or suppressing effect on the price of domestic like products. 19 U.S.C. § 1675a(a)(3).

According to the SAA, "the Commission must consider its prior injury determinations, including the . . . price effect . . . on the industry during the period preceding the issuance of an order." SAA at 884. In the original investigation, the Commission found that subject imports were underselling the domestic product. The Commission also found that pricing trends revealed a causal link between subject imports and harm to the domestic industry.

During the present review period domestic products were sold primarily to distributors and the subject imports were sold primarily to retailers, limiting the amount of comparative data. Even with the limited data, however, the Commission determined that there was a significant underselling. Remand Determ. at 19; Staff Report at V-25. The data for the retail market demonstrated that subject imports undersold the domestic product in every quarter since 1997, Staff Report at V-25, supporting the Commissions finding of underselling.[18]

Furthermore, the Commission found that the domestic industry

_____

[18]Moreover, pricing in the retail market affects pricing in the direct sales market. "[D]irect sales customers frequently compare the prices at retail with the prices offered through direct sales." Hrg. Tr., P.R. 153 at 38. Therefore, even if subject imports do not dramatically increase in the direct sales market, underselling in the retail market will have price effects throughout the industry.

is sensitive to price-based competition.[19]  Although purchaser

questionnaire responses identified quality as the most important

factor in purchasing decisions, these same questionnaires also

demonstrate that price is an important factor.  See Staff Report at

II-26, Table II-2 (indicating that the most important factors used

in purchasing decisions, as reported by U.S. purchasers, are

product consistency, product quality and price).  Furthermore, it

is reasonable for the Commission to infer that when consumers

consider products to be of comparable quality, they focus more on

the other factors used in purchasing decisions, such as the cost of

the good.  See Staff Report at II-28-29.[20]  Here, the Commission

---

[19]Chefline argues that the Final Determination contradicts
the Commission's finding of price sensitivity.  See Chefline's
Br. at 34; Porcelain-On-Steel Cooking Ware from China, Mexico,
and Taiwan, and Top-of-the-Stove Stainless Steel Cooking Ware
from Korea and Taiwan, Inv. Nos. 701-TA-267 and 268 (Review) and
731-TA-297-299, 304 & 305 (Review), USITC Pub. No. 3286 (March
2000), P.R. 206 at II-22.  The section of the Final Determination
to which Chefline refers, however, discusses U.S. demand
elasticity.  An analysis of the U.S. demand elasticity
demonstrates that the overall demand for top-of-the-stove
stainless steel cookware is not affected by price.  The
Commission, however, refers to "substitution elasticity" when
looking at the effect of price on consumer's choice between goods
of comparable quality.  Staff Report at II-35. Substitution
elasticity focuses on the degree to which subject imports and the
domestic product compete head-to-head for customers on the basis
of price.  See Id. at II-35 n.78.  The data in this section
supports the Commission's findings.

[20]Chefline argues that quality is the most important
purchasing factor for consumers.  The Commission, however, does
not need to make a finding that price is the "most" important
factor, but rather must determine whether or not subject imports
have a price-suppressing or depressing effect.  In this case, the
Commission could reasonably conclude that the price of subject

found that subject imports were "closing . . . the quality gap" and were of a comparable quality to domestically produced top-of-stove stainless steel cookware.  Remand Determ. at 19; see also Committee's Prehearing Br. at Ex. 13, Aff. Keith Peterson ¶¶ 7.1, 7.2; Hrg. Tr., P.R. 153 at 35 (discussing how a domestic producer lost an account when the importer switched from domestic to Korean suppliers "because the quality of the Korean product was just as good . . . and the price was much lower").  Domestic products, therefore, are sensitive to competition from the lower priced subject imports.  See, e.g., Hrg. Tr., P.R. 153 at 35 (discussing several domestic producers who were forced to lower prices to compete with Korean imports).

The Commission determined that as the quality of domestic products and subject imports become more and more similar "price is likely to play an even greater role in competition in the foreseeable future, and that the prices charged for subject imports will influence the prices received by the domestic industry." Remand Determ. at 19.  The Commission's finding regarding price effects is, as a result, supported by substantial evidence and in accordance with law.

---

imports negatively influence domestic prices.

## **Conclusion**

For the foregoing reasons, the Commission's remand determination is affirmed.

_____
Donald C. Pogue
Judge


Dated:     August 5, 2002
           New York, New York